**DISTRIGAS CORPORATION et al.,
Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent, Pacific Lighting Service Company et al., Intervenors.**

No. 73-1747.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 27, 1973.

Decided April 5, 1974.

Edwin S. Nail, Boston, Mass., with whom Justin R. Wolf and Charles A. Case, Jr., Washington, D. C., were on the brief, for petitioners.

John R. Staffier, Atty., Federal Power Commission with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Sol., Federal Power Commission were on the brief, for respondent.

Edward S. Kirby, Newark, N. J., for intervenor, Public Service Electric and Gas Co.

Richard B. Wolf, Washington, D. C., with whom Victor H. Kramer, Washington, D. C., was on the brief for intervenor, United States Representative John M. Murphy. John F. Dienelt, Washington, D. C., also entered an appearance for intervenor, United States Representative John M. Murphy.

Thomas D. Clarke, Los Angeles, Cal., with whom K. R. Edsall, Los Angeles, Cal., was on the brief for joint intervenors, Southern California Gas Co. and Pacific Lighting Service Co.

William I. Harkaway, Washington, D. C., was on the brief for intervenor, Consolidated Edison Co.

Sherman Chickering, C. Hayden Ames, Donald J. Richardson, Jr., and Edward P. Nelsen, San Francisco, Cal., were on the brief for intervenor, San Diego Gas and Electric Co.

Barbara M. Gunther and Joseph P. Stevens, Brooklyn, N. Y., were on the brief for intervenor, The Brooklyn Union Gas Co.

John W. Glendening Jr., and John S. Schmid, New York City, were on the brief for intervenor, Boston Gas Co., and others.

John H. Cooper, Jr., Houston, Tex., entered an appearance for intervenor, Exxon Corp.

Gerald W. Conway, Newark, N. J., entered an appearance for intervenor, New Jersey Natural Gas Co.

Robert J. Haggerty, Washington, D. C., entered an appearance for intervenor, Algoquin Lng., Inc.

Edward W. Stern, Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Gas Works.

Richard J. Sgarlato, Brooklyn, N. Y., entered an appearance for intervenor, B.L.A.S.T. Citizens, Inc.

Before BAZELON, Chief Judge, and WRIGHT and WILKEY, Circuit Judges.

BAZELON, Chief Judge:

Distrigas Corporation and its affiliates Distrigas of New York Corporation and Distrigas of Massachusetts Corporation[1] seek review of a Federal Power Commission order directing them to "file with the Commission applications pursuant to Section 7 of the Natural Gas Act for authorization to construct and operate . . . their liquefied natural gas terminal, storage, regasification, and related facilities on Staten Island, New York, and Everett, Massachusetts."[2] Distrigas challenges the order on two grounds. It contends that the Commission's attempt to apply Section 7[3] certification requirements to the facilities that Distrigas employs, or proposes to employ, to receive imports of liquefied natural gas and to store, process, and distribute the gas for sales in both interstate and intrastate commerce directly contravenes this Court's deci-

---

[1]. As discussed more fully in Part I, *infra*, petitioner Distrigas Corporation is presently engaged, pursuant to FPC authorization, in the importation of liquefied natural gas for receipt at facilities located on Staten Island, New York, and at Everett, Massachusetts; these facilities the subject of the order before us for review, are owned, respectively, by petitioners Distrigas of New York and Distrigas of Massachusetts. Petitioners, all subsidiaries of Eastern Energy Corporation, which, in turn, is a wholly-owned subsidiary of Cabot Corporation, will hereinafter be referred to collectively as "Distrigas."

[2]. FPC Order in Docket Nos. CP 73–78, et al., issued May 25, 1973, Joint Appendix at 1, 3; Order Denying Rehearing, issued June 20, 1973, Joint Appendix at 24.

[3]. 15 U.S.C. § 717f.

sion in Border Pipe Line Company v. F. P. C.[4] Distrigas contends further, and with somewhat greater vehemence, that because the Commission disclaimed jurisdiction over the facilities when it originally granted Distrigas authority to import natural gas, it is barred from exercising such jurisdiction now, whatever its statutory power and responsibility may be as to similar facilities and operations of other gas import companies.

We conclude that the Commission has jurisdiction under the Natural Gas Act to issue the kind of order before us in this case, and that exercise of its authority with respect to Distrigas is in no way precluded by the Commission's previous disclaimer. Our conclusion rests, however, on a statutory premise other than that which the Commission has invoked. We find it necessary, therefore, to remand the record to the Commission for further proceedings and action prerequisite to imposition of Section 7 requirements.

### I

Central to the issues presented in this petition are the provisions of Section 3 of the Natural Gas Act, that:

* * * [N]o person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good

cause shown, make such supplemental order in the premises as it may find necessary or appropriate.[5]

Pursuant to this Section, Distrigas applied to the Commission on February 17, 1970, for authority to import from Algeria up to six shiploads (later increased to fourteen shiploads) of liquefied natural gas annually for a term of twenty years. According to the application, the gas was to be delivered to Distrigas at terminals and related facilities that it proposed to construct at Everett, Massachusetts, and on Staten Island, New York, thence to be sold, approximately eighty-three percent to distributors and direct customers in the states of importation and seventeen percent to distributors in other states. Together with its application, Distrigas submitted to the Commission a request that it issue a disclaimer of jurisdiction as to any of Distrigas' activities that the Commission might deem outside its regulatory responsibility or, in the alternative, that it issue whatever authorization necessary to allow Distrigas to supply its prospective customers.

On March 9, 1972, the Commission issued Opinion No. 613,[6] in which it agreed with the initial decision of the hearing examiner [7] that Distrigas' proposed importation was in the public interest and therefore granted the requested Section 3 authority. In addition, the Commission gave extended consideration to the jurisdictional problem that Distrigas had posed. That problem was, in essence, whether and to what extent Distrigas was required to seek from the Commission Section 7 certification for its proposed facilities and sales; and this in turn depended on whether and to what extent Distrigas' operations would render it a "natural gas company" within the meaning of Section 2(6) of the Natural Gas Act—i. e., "a person engaged in the transportation of natural gas in interstate commerce, or the sale

---

4. 84 U.S.App.D.C. 142, 171 F.2d 149 (1948).

5. 15 U.S.C. § 717b.

6. 47 F.P.C. 752 (1972).

7. Docket No. CP 70–196, issued June 14, 1971, Joint Appendix at 35–125.

in interstate commerce of such gas for resale." [8]

The majority of the Commission found, in part, perhaps, in reliance on our decision in *Border Pipe Line Company*, that the importation of natural gas is not "interstate commerce" as those words are used in the Act.[9] It further found that the storage and regasification of liquefied natural gas were operations "separate and separable" both from the act of importation and, apparently, from the sale of the gas in interstate commerce.[10] The majority therefore decided to treat Distrigas, for jurisdictional purposes, as if it were a producer or gatherer of natural gas in the state of importation. While the Commission was clearly required by Section 3 to grant or deny import authority, the majority, observing that Distrigas proposed to take delivery of the gas at the ship's flange at the point of entry, held that foreign commerce and, hence, compulsory Section 3 jurisdiction ceased at that point.[11] And while Section 7 certification was clearly required for those sales of liquefied and regasified natural gas destined for resale in interstate commerce, the majority held that its jurisdiction over such sales attached only at the tailgate of the importer's plant. Thus, the majority concluded, Distrigas' facilities and its transport and sales of natural gas solely within the states of importation were outside its compulsory jurisdiction under either Section 3 or Section 7 and, therefore, did not require its certification.[12]

At the same time, the majority acknowledged that under Section 3 the Commission could take jurisdiction over Distrigas' proposed facilities and intrastate sales as part of the "terms and conditions" of authorizing importation, and that the controlling question was whether it was "necessary or appropriate" to the public interest that the Commission do so. The majority determined that it was not, that, on the contrary, "exemption of these projects [i. e., facilities and intrastate operations] from the federal regulatory umbrella will make them more attractive to private investors and lead to more gas at a lower price to the consumer, and effect this result sooner, than if [the Commission] controlled every detail and decision related thereto." [13] The majority went on to say, however, that in Distrigas' application the Commission confronted for the first time a proposal to import large quantities of liquefied natural gas for an extended period, and that its decision represented "only the first step in the development of a comprehensive Commission policy on long-term imports" of liquefied natural gas.[14] In short, the Commission warned that its estimate of where the public interest lay with respect to such imports might well change. Citing the provisions of Section 3 allowing the Commission "from time to time . . . [to] make such supplemental order in the premises as it may find necessary or appropriate," the majority recognized "its responsibility and authority to take such action if and when the public interest so requires." [15]

Two members of the Commission, Chairman Nassikas and Commissioner Moody, dissented from the majority's decision on the jurisdictional point, arguing that the public interest, the determinative criterion under Section 3, could be served only if the Commission took full regulatory authority over all of Distrigas' proposed operations and that, in any event, those operations constituted interstate commerce as defined in the Act. The majority nonetheless adhered to its original decision and denied appli-

---

8. 15 U.S.C. § 717a(6).

9. 47 F.P.C. at 758–59.

10. *Id.* at 756–57.

11. *Id.* at 759.

12. *Id.* at 756.

13. *Id.* at 760–61; 763.

14. *Id.* at 760.

15. *Id.* at 765.

cations for rehearing.[16] A petition to review the decision, filed in this Court, was subsequently dismissed on the petitioner's motion.[17]

Thereafter, with import authorization in hand and assertedly in reliance on the Commission's limited jurisdictional disclaimer, Distrigas proceeded to construction of its Everett and Staten Island facilities, expending very substantial sums on each.[18] Distrigas also applied to the Commission for (1) Section 3 authorization to import significant additional quantities of natural gas,[19] and (2) Section 7 certification of interstate sales of gas imported under the original authorization and the new authorizations for which it had applied.[20] Since the issuance of Opinion 613, however, the complexion of the Commission had undergone some change; two members having resigned and not having been replaced, Chairman Nassikas and Commissioner Moody were now in the majority. In response to Distrigas' new applications, the Commission issued, over the dissent of the third remaining member, the order presented here for review, which, in effect, reverses the Commission's jurisdictional determination in Opinion 613. The order states that, although in its original application Distrigas had proposed to operate primarily in intrastate commerce, its new applications, proposing "new and increased sales outside the states of importation," made clear that the Everett and Staten Island facilities would be used for the transportation and sale of gas in interstate commerce.[21] Finding that there were "no controverted facts relating to the issue of jurisdiction" and, therefore, that no hearing was required,[22] the Commission held that Section 7 certification was mandated for all of Distrigas' facilities and directed Distrigas to submit appropriate applications.

Distrigas thereupon filed an application for rehearing, contending, *inter alia,* that the Commission had supplied no rational basis or findings of fact to support its jurisdictional conclusion and that, in fact, Distrigas planned no material change in its proportion of interstate to intrastate sales. In denying rehearing, the Commission ignored this contention. Instead, the majority advanced two alternative theories that, it said, supported its assertion of jurisdiction. Jurisdiction could, according to the majority, be premised on "commingling"—the use of facilities to receive, store and process gas destined for both interstate and intrastate sales. Asserting that Opinion 613 had left open the question of what proportion of interstate sales would render import facilities jurisdictional, the majority observed that commingling had been the basis of its exercise of jurisdiction in its decision, subsequent to Opinion 613, in Columbia LNG Corporation.[23] But recognizing the regulatory problems that the commingling theory might pose,[24] the

---

16. 47 F.P.C. 1465 (1972).

17. Public Service Commission of the State of New York v. FPC, Docket No. 72–1588, dismissed Jan. 10, 1973.

18. The terminal at Everett was completed in November, 1972, and is now in operation; the terminal on Staten Island, now in partial operation, is scheduled for completion by mid-1974.

19. FPC Docket Nos. CP 73–78; CP 73–132.

20. FPC Docket Nos. CP 73–135; CP 73–205; and CP 73–230. In addition, another affiliate of Distrigas, Distrigas Pipeline Corporation, filed an application for authority to construct a pipeline between Staten Island and Woodbridge, New Jersey, to transport Distrigas' regasified imports to prospective New Jersey customers. FPC Docket No. CP 73–148.

21. Order, *supra* note 1, Joint Appendix at 2.

22. *Id.* at 3.

23. Opinion No. 622, 47 F.P.C. 1624 (1972). In *Columbia,* the Commission granted both import authority and Section 7 certification of the importer's terminal, regasification and storage facilities. No party in that case, however, challenged Section 7 jurisdiction, and the Commission simply noted that, in contrast to Distrigas, Columbia's operations were to be interstate in nature. Indeed, two commissioners, of four, concurred in the jurisdictional decision only because it was not a litigated issue. *Id.* at 1630 n. 6.

24. In particular, the facilities of a firm, the operations of which were largely or entirely intrastate at the outset and only later became interstate, would become jurisdictional only

Commission advanced, and adopted as its jurisdictional policy with respect to liquefied natural gas imports, an alternative, "interstate commerce" theory. It held that all imports of natural gas, whether destined for sale in the state of importation or other states, are in interstate commerce as that term is defined in Section 2(7) of the Act,[25] and that "[t]o the extent the *Border* decision could compel a contrary result, that holding is in error."[26] Thus, the majority concluded that Section 7 certification is mandatory under the Act for all of Distrigas' facilities and sales, and reiterated its directive to file the necessary applications. Distrigas thereupon timely filed this petition for review.[27]

## II

We are confronted with the question whether this Court's decision in Border Pipeline Company v. F. P. C. bars the Commission from requiring Section 7 certification of Distrigas' facilities. In *Border,* the Commission had attempted to apply Section 7 requirements to facilities employed to export to Mexico, by direct pipeline, gas produced in Texas. In disapproving the Commission's order, the Court said that, as a general matter of statutory construction, "interstate commerce" and "foreign commerce" are separate ideas and that the term "'[i]nterstate commerce' does not include foreign commerce, unless Congress by definition for the purposes of a particular statute includes them both in the single expression."[28] But Section 2(7)'s definition of interstate commerce does not expressly include foreign commerce;[29] on the contrary, the *Bor-*

*der* Court found strong indication in the legislative history that Congress had purposefully excluded foreign commerce from the definition. Moreover, both terms are employed in the Act, and one section of the Act, Section 3, applies to foreign commerce alone. These factors, in addition to the consistent Commission practice prior to *Border,* led the Court to conclude that Congress intended in the Act to treat interstate commerce and foreign commerce separately, and that, because *Border's* facilities were used solely for exports, they were elements of foreign commerce to which Section 7's requirements do not apply.

The Commission does not here contend that the *Border* Court's interpretation of the language and legislative history of the Act is necessarily and demonstrably incorrect, nor that, as applied to exports, *Border's* construction of the Act is unreasonable. Instead, it contends that both the statutory language and the relevant legislative history are ambiguous as to Congress' intent and cannot be supposed determinative of the extent to which the regulatory scheme applicable to interstate commerce was meant to apply to foreign commerce as well. This being so, the Commission argues, the proper scope of the term "interstate commerce" and, hence, of the Commission's Section 7 jurisdiction, can only be determined through an examination of the congressional policy behind the Act and the scheme of regulation created to achieve it.[30]

■ The Commission urges, first, that *Border* be distinguished from this case on the ground that, there, the Commission attempted to impose Section 7

---

after they were already constructed and in operation, making the traditional tests for Section 7 certification—economic feasibility, adequacy of supply, financing, costs, etc.—much more difficult to apply. Order Denying Rehearing, *supra* note 2, Joint Appendix at 29.

25. 15 U.S.C. § 717a(7).

26. Order Denying Rehearing, supra note 2, Joint Appendix at 28.

27. 15 U.S.C. § 717r.

28. 171 F.2d at 150.

29. Section 2(7) defines interstate commerce as "commerce between any point in a State and any point outside thereof . . . but only insofar as such commerce takes place within the United States." 15 U.S.C. § 717a(7).

30. *See, e. g.,* Mitchell v. Independent Ice & Cold Storage Co., 294 F.2d 186 (5th Cir.), cert. denied sub nom., Independent Ice & Cold Storage Co. v. Goldberg, 368 U.S. 952, 82 S.Ct. 394, 7 L.Ed.2d 386 (1961).

requirements on *export* facilities, while here the Commission asserts such jurisdiction only with respect to *import* facilities and sales of imported gas. And while it might reasonably be supposed, as the Court did in *Border,* that Congress would be concerned under Section 3 only with the fact of exportation, the same cannot be said of imports, as to which detailed regulation under Section 7 of "rates, practices, accounting, facilities and financing" is necessary to the public interest.[31] The Commission's suggested distinction makes, we think, a great deal of practical sense. We can, however, find no anchor for it either in the rationale of *Border* or, what is more important, in the statutory language. The *Border* Court found that Congress had distinguished, not between imports and exports, but between foreign and interstate commerce. We think that if *Border* stands, it must exclude imports quite as much as exports from the definition of interstate commerce.

The Commission next urges that, if *Border* cannot be distinguished, it must be overruled. The Commission argues that complete and comprehensive regulation of sales of liquefied natural gas and of the facilities related to its importation is required to protect consumers. The states, however, cannot be supposed capable of imposing or of exercising the necessary regulatory authority. In addition to possible constitutional barriers to state regulation, the importation, sale, and distribution of liquefied natural gas in any one state will have, according to the Commission, a marked impact on interstate commerce and, particularly, on domestic gas production and supply, since liquefied natural gas projects may become capable of drawing available capital away from domestic exploration and development. If, however, regulation were left to the states, the possibili-

ty of competition among them in attracting such projects and of inconsistencies in regulatory approach would make protection of such distinctly federal interests, the interests of consumers in all states, impossible. In short, the Commission contends that unless its interstate commerce jurisdiction is held to extend to all sales of imported natural gas and the facilities related thereto, there will result precisely the sort of "attractive regulatory gap" that Congress intended the Natural Gas Act to fill.

Despite the power of this argument, we decline to overrule *Border* at this time. We agree with the Commission that neither the language nor the legislative history of the Act's interstate commerce definition unambiguously establishes the correctness of the *Border* construction. That construction has, however, received at least some confirmation in subsequent congressional actions. Since *Border,* the Commission has asked Congress, on fourteen separate occasions, to enact legislation overruling it; each time, Congress has refused.[32] Indeed, in 1953, Congress amended the Federal Power Act to include the equivalent of the *Border* interpretation,[33] thus implicitly approving it.[34] Moreover, *Border* has governed Commission regulatory efforts with respect to imports and exports of natural gas for over twenty-five years, and while we cannot gauge from the record and arguments before us the extent to which private concerns have been arranged in reliance on it, that extent may well be considerable. In our view, these considerations must militate strongly against our now holding that *Border* was incorrect.[35]

■ Nonetheless, we would not hesitate to do so were we convinced that *Border's* construction would inevitably

---

31. 171 F.2d at 151.

32. *See* Initial Opinion of the Presiding Examiner, *supra* note 7, Joint Appendix at 81; 42 FPC Annual Report 15 (1962).

33. 67 Stat. 461 (1953); 16 U.S.C. § 824a(f).

34. *See* H.Rep.No.978, 83d Cong., 1st Sess., at 2 (1953).

35. *See* Flood v. Kuhn, 407 U.S. 258, 281–285, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).

place imports of natural gas into the sort of regulatory gap the Commission has described. It has long been recognized that the purpose of the Natural Gas Act was "to protect consumers against exploitation at the hands of natural gas companies." [36] And this purpose was to be achieved by FPC regulation "broadly complementary to that reserved to the States, so that there would be no 'gaps' for private interests to subvert the public welfare." [37] We fully recognize, therefore, that this purpose must be the determinative guide in construction of the Act's regulatory scheme. We are not convinced, however, that any attractive regulatory gap need result if *Border* is allowed to stand. Under Section 3, the Commission's authority over imports of natural gas is at once plenary and elastic. It may authorize imports, as it did in Opinion 613, subject to no conditions whatever as to facilities and subsequent use; it may deny import authorization altogether. So long as its conclusion is reasonable and reasonably supported by substantial record evidence, the Commission may also and quite properly adopt a position somewhere between these two poles, granting import authority but subjecting it to "terms and conditions" that it finds "necessary or appropriate" to the public interest. More particularly, we can see no objection, in theory, to a Commission determination along the following lines: that, while imports of natural gas are a useful source of supply, their potentially detrimental effect on domestic commerce can be avoided and the interest of consumers protected only if they are subject to comprehensive regulation; such regulation cannot or will not, as a practical matter, be imposed by the states; such imports will, therefore, be in the public interest only if the Commission exercises with respect to them the same detailed regulatory authority that it exercises with respect to interstate commerce in natural gas. In short, we find it fully within the Commission's power, so long as that power is responsibly exercised, to impose on imports of natural gas the equivalent of Section 7 certification requirements both as to facilities and—what we suspect is of more vital concern to the Commission and to petitioners—as to sales within and without the state of importation. Indeed, we think that Section 3 supplies the Commission not only with the power necessary to prevent gaps in regulation, but also with flexibility in exercising that power—flexibility far greater than would be the case were we to hold that imports are interstate commerce, automatically and compulsorily subject to the entire panoply of Section 7's requirements.

### III

We think, therefore, that as a matter of jurisdiction the Commission had authority under Section 3 to issue the kind of order before us here. Nor do we think that exercise of that authority over Distrigas' facilities is barred by the Commission's limited disclaimer in Opinion 613. Distrigas argues that once the Commission's previous decision on the jurisdictional point became final and Distrigas consequently acted in reliance thereon in contracting with its customers and constructing its facilities, it was no longer open to the Commission to change its mind and to assert jurisdiction where it had previously declined to do so. In support of this contention, Distrigas refers us to the Supreme Court's decision in United States v. Seatrain Lines, Inc.,[38] in which the Court rejected an attempt by the Interstate Commerce Commission to revoke certification it had previously granted to an interstate water carrier. That decision, however, rested heavily on the Court's doubt that the ICC would have had, in the first instance, statutory authority to

36. FPC v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944).

37. FPC v. Louisiana Power & Light Co., et al., 406 U.S. 621, 631, 92 S.Ct. 1827, 1833,

32 L.Ed.2d 369 (1972); see FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 19–20, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961).

38. 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947).

take the action it did and on the absence of any statutory provision allowing revocation of water carrier certificates. Here, in contrast, Section 3 expressly allows the Commission to re-examine its decisions authorizing imports and to "make such supplemental order in the premises as it may find necessary or appropriate." Moreover, as we have recounted at some length above,[39] Opinion 613 frankly warned Distrigas that its jurisdictional decision was tentative only, and might be changed should the Commission determine, in the future, that the public interest so required. We think, therefore, that under Section 3 and Opinion 613 itself, any "right" to non-regulation that the Commission's previous decision can be supposed to have vested in Distrigas was entirely contingent on the Commission's continuing to view such non-regulation as in the public interest. If Distrigas relied on an interpretation of Opinion 613 to the contrary, assuming that that decision granted it permanent immunity from regulation, its reliance was misplaced.

We note, however, that Distrigas' argument from reliance comes to us in a highly abstract form. The only obligation placed on Distrigas by the present order is that it file applications under Section 7 for certification of its existing facilities—an obligation with which, we are informed, Distrigas has already complied.[40] Although we recognize that compliance with Section 7's procedural requirements itself entails some costs,[41] we can see no basis for supposing, at this point, that the Commission will refuse certification to Distrigas' facilities or to the contractual arrangements

into which it has already entered. In fact, there is reason to suppose the contrary. The Commission has long regarded Section 3's "public interest" standard and Section 7's "public convenience and necessity" standard as substantially equivalent.[42] The hearing examiner expressly recognized this equivalence in his decision approving Distrigas' original application for import authority,[43] in which he gave extensive consideration both to Distrigas' proposed facilities and to its proposed sales; and this decision, on this point at least, was adopted by the Commission in Opinion 613.[44] To some extent, therefore, the Commission must be supposed to have found that Distrigas' facilities and sales, as then contemplated, would meet the "public convenience and necessity" standard of Section 7. Thus, should the Commission eventually decide that those facilities and sales proposed in Distrigas' original application do not now merit Section 7 certification, it would, in our view, be under some burden to justify its decision, on the basis of altered circumstances or otherwise. Moreover, in denying Distrigas' application for rehearing, the Commission acknowledged "the problems and equities associated with application of a change of [jurisdictional] policy."[45] Given this acknowledgment, we cannot now assume that the Commission would, in applying Section 7 requirements to Distrigas, fail to abide the principles of fairness implicit in all standards governing exercise of regulatory power.[46]

## IV

■ While we do not believe the Commission in any way estopped from

---

39. Text at notes 13–15 *supra*.

40. It has done so, of course, under protest, its applications contingent upon disposition of this appeal. Letter to the Court Clerk from Counsel for Distrigas, dated Nov. 20, 1973.

41. *Cf.* Hughes Air Corporation, et al. v. CAB, 160 U.S.App.D.C. 301, at 309–10, 492 F.2d 567, at 575–76 (1973).

42. *See, e. g.*, El Paso Natural Gas Co., 38 F.P.C. 311, 319 (1967) ; The Montana Power Co., 11 F.P.C. 1, 7 (1952).

43. Initial Opinion of the Presiding Examiner, *supra* note 7, Joint Appendix at 85–86.

44. 47 F.P.C. at 766.

45. Joint Appendix at 30.

46. *See* Amalgamated Meat Cutters v. Connally, 337 F.Supp. 737, 755–758 (D.D.C.1971) (three-judge court) (Opinion by Leventhal, Circuit Judge).

imposing on Distrigas the equivalent of Section 7 requirements, two considerations prevent us, on the present record, from affirming the Commission's order as a proper exercise of its Section 3 authority. First, Section 3 allows the Commission to issue supplemental orders, subjecting previously authorized imports to additional "terms and conditions," only if it does so "after opportunity for hearing, and for good cause shown. . . ." Because the Commission did not invoke Section 3 as its authority for the present order, it did not provide the hearing that that Section expressly mandates. Equally important, while we think that the Commission *may* impose, under Section 3, the equivalent of Section 7 requirements, it may do so only if it affirmatively finds that applying such requirements to imports is "necessary or appropriate" to the public interest. Because the Commission, holding imports included in interstate commerce, viewed its exercise of jurisdiction as mandatory, it did not make the necessary Section 3 determination here. Although it may seem obvious, from the arguments it has presented, that the Commission does consider comprehensive regulation of imports required by the public interest, we cannot assume this to be the case. It is for the Commission in the first instance to determine, after reasoned consideration and on the basis of substantial evidence, whether and in what manner to exercise its flexible Section 3 power, and this determination will in turn be subject to the normal review processes provided in the Act.

We therefore remand the record for supplementation, with directions that the Commission conduct the hearing required by Section 3 and that it supply findings and reasons to support its jurisdictional determination under Section 3's public interest standard. As we observed above, the Commission originally grounded its order on a "commingling" theory. It eschewed that theory, however, in its order denying rehearing. In addition, it failed, both in its original order and in its order denying rehearing, to make any findings of jurisdictional fact or to provide any reasoned analysis to support a conclusion that, because of commingling, the Commission has jurisdiction over Distrigas' facilities and sales. For these reasons, we cannot look to commingling as a ground for affirming the Commission's present order.[47] At the same time, nothing in this opinion precludes the Commission, on remand, from reverting to the commingling theory, rather than turning to Section 3, if it does so in a manner that allows responsible judicial review.

So ordered.

47. *See* FPC v. Louisiana Power & Light Co., et al., 406 U.S. 621, 647, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972) ; Louisiana Power & Light Co., et al. v. FPC, 483 F.2d 623, 631– 632 (5th Cir. 1973). *Cf.* SEC v. Chenery Corp. et al., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).