**MURPHY OIL CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**No. 77–1720.**

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1978.

Decided Dec. 28, 1978.

Platt W. Davis, III, Vinson & Elkins, Washington, D. C., argued, J. Evans Attwell, Vinson & Elkins, Houston, Tex., and H. Y. Rowe, El Dorado, Ark., on briefs, for petitioner.

Joseph G. Stiles, Atty., Federal Energy Regulatory Commission, Washington, D. C., argued, Robert R. Nordhaus, Gen. Counsel, and Howard E. Shapiro, Sol., Washington, D. C., on brief, for respondent.

Before BRIGHT and ROSS, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The controversy before us concerns the rate chargeable by the Petitioner, Murphy Oil Corporation (Murphy), for the sale of gas from the San Juan Basin area of New Mexico. Murphy, the seller, pursuant to § 4(d) of the Natural Gas Act,[1] filed for a rate increase. The proceeding below involves the Commission's[2] disposition of Murphy's requested increase. The Commission held that the lower of two arguably applicable rate schedules controlled, the monetary difference between the two under the circumstances amounting to a sum in excess of a hundred thousand dollars. We affirm the Commission.

Murphy was the lessee under a number of oil and gas leases in New Mexico when, in 1959, it executed a "farmout" agreement with International Oil Corporation (International). This agreement provided substantially that International would be assigned the leases, would drill the wells, and would have the right to produce and market any gas discovered. Murphy would receive an overriding royalty interest of 1/16 of the production and would retain a reversionary interest in the form of an option to convert its royalty interest to a full working interest of 1/4 upon "pay-out," that is, when all

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 15 U.S.C. § 717 et seq.

2. The Federal Power Commission had ceased to exist on September 10, 1977, pursuant to the provisions of the Department of Energy Organization Act, Pub.L. No. 95–91, 42 U.S.C. § 7101 et seq. (August 4, 1977), and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 13, 1977). Most of its functions and regulatory responsibilities were transferred to the Federal Energy Regulatory Commission, which, as an independent administrative agency within the Department of Energy, was activated on October 1, 1977. Section 705(e) of the Organization Act provides for the substitution of the new Commission as a party in the ongoing proceedings. The term "Commission" as employed in the context of an action taken or statement made prior to October 1, 1977, refers to the Federal Power Commission; otherwise used, the reference will be construed to refer to the Federal Energy Regulatory Commission.

the costs of drilling had been recovered by International. International subsequently drilled the wells and Murphy assigned the gas leases to it.

On May 9, 1960, Southwest Production Company (Southwest), the successor to International, executed a gas purchase contract with El Paso Natural Gas Company (El Paso). This gas purchase contract covered the "Seller's interest in all gas produced"[3] from the subject wells. Immediately thereafter, Southwest applied to the Commission for a certificate of public convenience and necessity,[4] which authorized the sale of gas in interstate commerce to El Paso when it was issued in 1961.[5]

In 1971, Beta Development Company (Beta), the successor to Southwest, notified Murphy that "pay-out" had occurred, i. e., of its recovery of all costs connected with the well drilling. Murphy accordingly exercised its option and converted its overriding royalty interest to a ¼ working interest. Murphy substantially adopted the terms of the 1960 gas purchase contract with El Paso for a one year period[6] and sought from the Commission a certificate of public convenience and necessity for its working interest. The certificate was issued by the Commission late in 1971.[7] Although there is some controversy over whether the Commission treated this certificate application as that of a new producer or as that of a successor in interest, the certificate clearly states that it is issued

> without prejudice to any findings or orders which have been or may hereafter be

made by the Commission in any proceeding now pending or hereafter instituted by or against Applicant. Further, our action in this proceeding shall not foreclose or prejudice any future proceedings relating to the operation of any price or related provisions in the gas purchase contract herein involved.[8]

On April 1, 1972, following the issuance of this certificate, Murphy entered into a long term gas purchase contract with El Paso.

The instant proceeding began in 1975, when Murphy filed a notice of a proposed rate increase with the Commission.[9] Murphy was seeking to take advantage of a Commission order that established a higher "new" gas rate of 35¢/MCF for gas produced in the Rocky Mountain area under specified conditions.[10] The critical requirement of Paragraph E, as applied to this case, was that the gas must be "sold under contracts dated on or after October 1, 1968." The Commission temporarily suspended Murphy's proposed rate increase, contending that, for rate-making purposes, the current sales were made under the original 1960 contract rather than under the 1972 contract, and ordered a hearing held to determine the proper rate. The parties agreed there was no factual dispute and submitted the case to an Administrative Law Judge who, in 1976, ruled that Murphy was governed by the rate set in the 1960 contract between Southwest and El Paso.

The decision was appealed to the Commission, which, in 1977, modified the initial

---

3. Article I, "Dedication and Reservations," Section 1.

4. Procedure pursuant to the Natural Gas Act § 7, 15 U.S.C. § 717f.

5. Docket No. CI60–686, 25 F.P.C. 1370 (1961).

6. This is described as a "Limited Ratification by Murphy Oil Corporation of Gas Purchase Contract dated May 9, 1960," under which Murphy agreed to sell gas attributable to its working interest to El Paso for the period of one year from March 1, 1971, in accordance with the terms of the 1960 Southwest-El Paso contract, with exceptions not here critical.

7. Docket No. CI72–135.

8. Findings and Order After Statutory Hearing Issuing Certificate of Public Convenience and Necessity and Amending Order Issuing Certificate, Paragraph C, Nov. 23, 1971.

9. Pursuant to the Natural Gas Act § 4(d), 15 U.S.C. § 717c(d) and 18 C.F.R. § 154.94.

10. Ordering Paragraph E, Opinion No. 699–H, 52 F.P.C. 1604, 1658 (1974). Murphy frankly states that it "does not believe that qualification for the rate established in Ordering Paragraph (E) is to be determined by any of the criteria established for qualification for the nationwide rate established in Ordering Paragraph (A) for post-1973 contracts."

decision by holding that Murphy was limited to the standard rate of 24¢/MCF permitted gas producers selling "old" gas.[11] The Commission, relying upon its decision in *Phillips Petroleum Co. Opinion No. 75*, 55 F.P.C. —— (1976), *aff'd*, 556 F.2d 466 (10th Cir. 1977), held that the contract under which the gas was first dedicated in interstate commerce, here the 1960 contract, determined whether a producer qualified for the 35¢ rate allowed in Paragraph E, not the new contract entered into after the conversion of a royalty interest to a working interest. All possible administrative appeals were exhausted by Murphy, and the case was then properly presented to this court.

■ We note at the outset that there is some controversy concerning the status the Commission accorded Murphy in 1971 when a new certificate of public necessity and convenience was sought. Murphy contends that the application made and certificate issued were for "initial" service and therefore the principles of res judicata and estoppel prevent the Commission from determining the appropriate rate under the 1960 contract as a continuation of service. On the other hand, the Commission contended that its treatment of the application and certificate was at all times consistent with that due a successor in interest seeking a continuation of service. Even assuming that the Commission treated the application as one for initial service, we find it unnecessary to rule on the applicability of res judicata and estoppel. The certificate issued to Murphy clearly states that it was to have no binding or preclusive effect on any future Commission decisions as to the applicable price for gas sold by Murphy.[12] The petitioner's reliance on *United States v. Seatrain Lines, Inc.*, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947), where the Interstate Commerce Commission was barred from revoking or altering a certificate to implement a change in policy, is misplaced. The *Seatrain* case, as the court pointed out in *Distrigas Corp. v. Federal Power Commis-*

*sion*, 162 U.S.App.D.C. 1, 7, 8, 495 F.2d 1057, 1064–65 (1974), "rested heavily on the Court's doubt that the ICC would have had, in the first instance, statutory authority to take the action it did," a doubt we do not share with respect to the Commissioner's rate-making powers, particularly in view of the provisions of the frank warning in the certificate of public convenience and necessity.

Moving to the primary issue in this case, whether or not the gas is being sold in interstate commerce under the 1960 contract or the 1972 contract, as far as the regulatory purposes of the Commission are concerned, we must first look briefly at the background of the regulatory system of the Commission. "The fundamental purpose of the Natural Gas Act is to assure an adequate and reliable supply of gas at reasonable prices." *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1958, 56 L.Ed.2d 505, 510 (1978). To accomplish this the Commission may "control both the terms on which a service is provided to the interstate market and the conditions on which it will cease." *Id.* In short, the Act was "so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Id.* (citing *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 79 S.Ct. 317, 3 L.Ed.2d 300 (1959)). Accordingly, the Commission has adopted a system whereby different prices are permitted for "old" gas and "new" gas in an effort to encourage new development without permitting windfall profits for established wells. As a means of implementing this regulation for the public interest, it has been held that "a two-price rate structure will both provide a useful incentive to exploration and prevent excessive producer profits." *Permian Basin Area Rate Cases*, 390 U.S. 747, 798, 88 S.Ct. 1344, 1376, 20 L.Ed.2d 312 (1968).

■ Although it seems clear that Murphy's gas is "old" gas in a realistic sense, the wells having been drilled in 1960, Mur-

---

**11.** Opinion No. 658, 49 F.P.C. 924 (1973).

**12.** *See* text accompanying n. 8, *supra*.

948

phy may nevertheless be allowed a higher price for "new" gas if, but only if, it qualifies for such under the Commission's regulations. The regulations are not crystal clear and are subject to varying interpretations. At this point it is pertinent to observe that the Commission's interpretation of its own regulations is entitled to great deference. When a case

> involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Furthermore

> the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).

■ All the sales in the instant proceeding were dedicated to interstate commerce, subjected to the Commission's regulatory control, and vintaged for rate-making purposes under the 1960 contract. At the time the 1960 contract was entered into, Murphy had assigned the leases to International and possessed only an overriding royalty interest and an option to convert to a working interest at some uncertain future date. International, "having full ownership of the leasehold interest, had the right to dedicate, which it did, its entire interest to interstate commerce." *Phillips Petroleum Co. v. Federal Power Commission*, 556 F.2d 466, 470 (10th Cir. 1977). "The initiation of interstate service pursuant to the certificate

dedicated all fields subject to that certificate." *California v. Southland Royalty Co.*, 436 U.S. at 525, 98 S.Ct. at 1959, 56 L.Ed.2d at 511.

Moreover, the dedication of the entire gas reserve was for an unlimited period of time not affected by the length of the contract and interstate sales can not be discontinued without express authorization by the Commission.

> The Commission reasonably concluded that under the statute the obligation to continue service attached to the gas, not as a matter of contract but as a matter of law, and bound all those with dominion and power of sale over the gas, including the lessor to whom it reverted. . . . Private contractual arrangements might shift control of the facilities and thereby determine *who* is obligated to provide that service, but the parties may not simply agree to terminate the service obligation without the Commission's permission.

*California v. Southland Royalty Co.*, 436 U.S. at 526–527, 98 S.Ct. at 1959–60, 56 L.Ed.2d at 512 (emphasis in original).

Murphy claims that this does irreparable harm to property law in that it would permit one to dedicate gas that was owned by another. Murphy's contention is that the gas could not have been previously dedicated, since Southwest, the farmout recipient, had no ownership interest in the gas that permitted it either to contract to sell or to dedicate it. This argument was expressly rejected by the Supreme Court in *California v. Southland Royalty Co.* There a lessee for a term of years sold gas in interstate commerce and accepted a certificate of unlimited duration from the FPC. In subsequent rate litigation, in countering the argument that the gas at issue "was never impressed with an obligation to serve the interstate market because it was never 'dedicated' to an interstate sale" since "no man can dedicate what he does not own," the Court pointed out that "gas which is 'dedicated' pursuant to the Natural Gas Act is not surrendered to the public; it is simply placed within the jurisdiction of the Commission, so that it may be sold to the public

at the 'just and reasonable' rates specified by § 4(a) of the Act." *California v. Southland Royalty Co.*, 436 U.S. at 527, 98 S.Ct. at 1960, 56 L.Ed.2d at 512. Thus it is clear that by "dedicating" gas to the interstate market a producer does not, by such dedication alone, dispose of gas that belongs to another, but only establishes its regulatory status. An attempt to literally apply the black letter concepts of Tiffany cannot be successful where inimical to the public interests protected by the Natural Gas Act discussed earlier.

■ The dedication of all the gas to interstate commerce, done pursuant to the certificate issued under the 1960 contract, fixed, as well, the applicable date for determining the rate chargeable for the subject gas. "Under the Commission's rate structure, the applicable maximum price for a producer's sale is determined . . . by the moment at which the gas was first dedicated to the interstate market . . ." *Permian Basin*, 390 U.S. at 795, 88 S.Ct. at 1375. In short, since the 1960 contract dedicated the gas to interstate commerce and subjected it to the Commission's regulatory authority, it follows that for regulatory purposes the gas is being sold under the 1960 contract, as the Commission ruled.

The interpretation made is consistent with the legislative purpose of the Natural Gas Act. A contrary interpretation could open the door to a flood of attempts to defeat the regulatory purpose of the Commission by use of short term contracts.

> [T]he way would be clear for every independent producer of natural gas to seek certification only for the limited period of its initial contract with the transmission company, and thus automatically be free at a future date, untrammelled by Commission regulation, to reassess whether it desired to continue serving the interstate market.

*Sunray Mid-Continent Oil Co. v. Federal Power Commission*, 364 U.S. 137, 142, 80 S.Ct. 1392, 1396, 4 L.Ed.2d 1623 (1960).

We think the Commission's interpretation and application of its regulations is reasonable in light of the circumstances of the case and the public interest in the availability of natural gas supplies.

The decision of the Commission is affirmed.