COMPANIA DE GAS DE NUEVO LAREDO, S. A., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Entex, Inc., Intervenor.

ENTEX, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Nos. 78–1001, 78–1071.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1979.

Decided April 19, 1979.

Carlos M. Zaffirini, Laredo, Tex., for petitioner in No. 78–1001.

George F. Goolsby, Houston, Tex., with whom Wayne D. Johnson, was on the brief, for petitioner in No. 78–1071 and intervenor in No. 78–1001.

Joanne Leveque, Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent. Howard E. Shapiro, Sol. and Steven A. Taube, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

Also Joseph G. Stiles, Atty., Federal Energy Regulatory Commission, Washington, D. C., entered an appearance for respondent.

Also John J. Powers, III, and Bruce E. Fein, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent in No. 78–1071.

Before McGOWAN and LEVENTHAL, Circuit Judges, and MARKEY,* Chief Judge of the United States Court of Customs and Patent Appeals.

McGOWAN, Circuit Judge:

These consolidated petitions for review of an order of the Federal Energy Regulatory Commission (Commission) relate to the regulatory aspects of a contractual dispute growing out of the exportation of natural gas by Entex, Inc. (Entex) to Compania de Gas de Nuevo Laredo, S.A. (CGNL).[1]

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. The order under review was issued on September 30, 1977, in two related dockets, *Entex, Inc.*, Docket No. G–103, and *Compania de Gas de Nuevo Laredo, S.A.*, Docket No. CP76–452.

The Federal Energy Regulatory Commission is a successor of the Federal Power Commission. The term "Commission" hereinafter is used interchangeably, referring either to the Federal Energy Regulatory Commission or to its predecessor agency.

In No. 78–1001, CGNL challenges the Commission's determination that, at least for regulatory purposes, the currently effective rate for the sale of gas to CGNL is that specified in supplemental agreements between the parties, rather than that specified in their original contract. In No. 78–1071, Entex seeks to overturn a condition imposed on its grant of export authority under which Entex, prior to suspending service to CGNL because of nonpayment, is required to obtain the Commission's approval. For the reasons hereinafter appearing, we affirm the Commission in No. 78–1001, but remand in No. 78–1071 for further proceedings.

### I

This case arises from a contractual dispute between CGNL, a privately-owned natural gas distribution company that sells gas in and near the City of Nuevo Laredo in the Republic of Mexico, and Entex, a natural gas distribution company that operates in intrastate commerce in Texas, Louisiana, and Mississippi. Entex, in addition to its intrastate operations, has a longstanding contract to export gas to CGNL.

Entex exports gas to CGNL pursuant to a Commission order issued in 1945 under section 3 of the Natural Gas Act.[2] That order authorized Entex's predecessor to export gas to CGNL "in accordance with the terms and provisions" of a 1944 contract between the parties and "upon the terms and conditions" of the order itself. *United Gas Corp.*, 4 F.P.C. 840, 841 (1945). In the 1944 contract, the parties had (1) agreed to a fixed rate for the sale of gas at 27.5 cents per Mcf, (2) stipulated that Texas law was to govern any disputes arising under the contract, and (3) vested Entex's predeces-

sor, in the event that CGNL failed to pay the balance due on its account for more than sixty days, with the right to suspend gas deliveries.

On numerous occasions after 1945, the parties hereto (or their predecessors) amended the contract pursuant to supplemental agreements. These amendments included several rate hikes and the inclusion of a "pass through" clause permitting Entex to adjust the rate upward or downward to reflect, *inter alia*, its costs of purchasing gas for resale to CGNL. On no occasion, however, was the Commission called upon to review these amendments, which, with a single exception, were not even filed with the Commission.

CGNL's cost of purchasing gas from Entex rose markedly as a result of the amendments to the contract. The "pass through" provision, for example, resulted in a substantial price increase in 1973, when the Texas Railroad Commission, in voiding Entex's contract with its gas supplier, substituted a price formula that raised the cost to Entex of purchasing gas for resale to CGNL.

Beginning in late 1974, CGNL, apparently unable to pass on to its customers the higher gas costs, fell behind in paying its bills to Entex. When this debt had grown to more than a half million dollars, Entex notified CGNL and the Mexican government that, pursuant to the contract as amended, Entex intended to suspend service unless CGNL paid the balance due on its account. The Mexican government responded by informing Entex that CGNL had been urged to discharge the debt.

Rather than discharging the debt, CGNL, on the day before Entex was to suspend

---

**2.** Section 3 provides:

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public

interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

15 U.S.C. § 717b (1976).

service, filed suit in the United States District Court for the Southern District of Texas. CGNL petitioned the court to conduct an accounting between the parties, to void certain provisions in the contract as unconscionable, and to bar Entex from suspending gas deliveries. The District Court refused to issue a preliminary injunction, and CGNL appealed. Entex, subject to a stay pending appeal, was required to continue deliveries to CGNL. In the meantime, however, Pemex, Mexico's government owned and operated petroleum and gas corporation, began to supply gas to CGNL, thereby reducing the demand for exported gas. Moreover, on July 13, 1976, the Mexican government took possession of the property and rights of CGNL.

On July 23, 1976, CGNL filed a complaint with the Commission seeking to prohibit Entex from terminating service and requesting the Commission to determine the currently effective rate for the sale of gas to CGNL. The Commission, on July 24, 1976, issued an order requiring Entex to continue its deliveries pending resolution of CGNL's complaint. Following this order, CGNL moved for, and was granted, a voluntary dismissal of its appeal to the Fifth Circuit of the denial of the injunction against Entex. On August 18, 1976, the District Court for the Southern District of Texas stayed the suit against Entex pending resolution of the matters before the Commission.

On September 3, 1976, the Commission ordered a hearing on the issues raised in CGNL's complaint and the issue whether the continued exportation of natural gas to CGNL was consistent with the public interest. After a hearing and further briefing, the administrative law judge, on February 15, 1977, issued his initial opinion, concluding (1) that, at least at the contract rate as amended, the continued exportation of natural gas to CGNL was not inconsistent with the public interest, (2) that, at least insofar

as the Commission's determination of "public interest" was concerned, the "contract rate as amended by the various amendatory and supplemental agreements [was] the currently effective rate," and (3) that, in the event Entex sought to suspend deliveries for nonpayment, "a further order of the Commission would be required for effectuation."

On September 30, 1977, the Commission issued an opinion affirming the initial decision. These petitions for review followed.

II

The issue in No. 78–1001 is whether the currently effective rate, from a regulatory standpoint, is that specified in the 1944 contract or that deriving from the supplemental agreements between the parties.[3] CGNL, in support of its view that the 1944 rate is currently effective, argues that, by reason of (1) the 1945 order authorizing Entex to export gas to CGNL, and (2) the Commission's regulations, Entex is bound to sell and deliver gas at the 1944 rate. The Commission and Entex respond that neither the 1945 order nor the Commission's regulations mandated Commission approval of the rate hikes in the supplemental agreements and that, for regulatory purposes, the currently effective rate is that provided for in the supplemental agreements.

We turn now to these arguments. First, with regard to the 1945 order, CGNL asserts that, insofar as the Commission authorized Entex to export gas to CGNL "in accordance with the terms and conditions" of the 1944 contract, the rate specified in that contract is still applicable because the Commission never approved any of the supplemental agreements. In this regard, CGNL relies on *Distrigas Corp. v. Federal Power Commission*, 162 U.S.App.D.C. 1, 8, 495 F.2d 1057, 1064 (1974), where, in a case involving the importation of natural gas, this court noted:

> The administrative law judge correctly determined that CGNL had demonstrated neither the relevance, nor the significance, of the requested information.

---

**3.** CGNL also argues that the administrative law judge, by denying various discovery requests, abused his discretion and deprived CGNL of its right to a full hearing. Upon reviewing the record, we find no such abuse of discretion.

Under Section 3, the Commission's authority over imports of natural gas is at once plenary and elastic. It may authorize imports . . . subject to no conditions whatever as to facilities and subsequent use; it may deny import authorization altogether. So long as its conclusion is reasonable and reasonably supported by substantial record evidence, the Commission may also and quite properly adopt a position somewhere between these two poles, granting import authority but subjecting it to "terms and conditions" that it finds "necessary or appropriate" to the public interest. . . . In short, we find it fully within the Commission's power, so long as that power is responsibly exercised, to impose on imports of natural gas the equivalent of Section 7 certification requirements both as to facilities and . . . as to sales within and without the state of importation.

The 1945 order, in CGNL's view, is to be interpreted as an exercise of section 3 authority, not unlike that approved in *Distrigas*, over the terms and conditions of the exportation of gas to CGNL.

■ This argument, we think, misconstrues the 1945 order wherein the Commission authorized Entex "to export natural gas from the United States to Mexico . . . in accordance with the terms and conditions of the [1944] contract . . . and upon the terms and conditions of this order." In the proceedings under review, the administrative law judge concluded that the Commission, in so conditioning Entex's export authority, sought not to preclude further rate changes absent Commission approval, but rather to establish that the applicable rate at any point in time was that currently agreed upon by the parties. We find nothing in the language of the 1945 order or in the record to suggest a contrary conclusion.[4] Moreover, the Commission, when it has sought to require prior approval of contract modifications, has done so in unambiguous terms that are lacking here. *See Columbia*

*LNG Corp.*, 47 F.P.C. 1624, 1639–41, 1648–50 (1972).

Nor can CGNL take refuge in our *Distrigas* opinion. In *Distrigas* we held that the Commission has discretionary authority under section 3 to condition grants of import authority so as "to impose . . . the equivalent of Section 7 certification requirements both as to facilities and . . . as to sales." 162 U.S.App.D.C. at 8, 495 F.2d at 1064. The issue here, however, is not whether the Commission had the discretionary authority to require prior approval of rate changes under the contract, but rather whether the Commission in fact imposed such a requirement in the 1945 order. Having concluded that it did not, we fail to see how *Distrigas* lends support to CGNL's position.

■ CGNL's second argument in support of its view that the currently effective rate is that specified in the 1944 contract derives from section 153.8 of the Commission's regulations, which provides that:

Persons authorized to export natural gas from the United States to a foreign country or to import natural gas from a foreign country shall file two full and complete copies of every contract and the amendments thereto, presently or hereafter effective, for such export or import, together with all rate schedules, agreements, leases or other writings, tariffs, classifications, rules and regulations relative to such export or import in the manner specified in Part 154 of this chapter, except that the requirements of § 154.31 through § 154.41 shall not be applicable.

18 C.F.R. § 153.8 (1978). It is CGNL's position that the supplemental agreements are invalid inasmuch as they were neither filed with, nor approved by, the Commission as, so CGNL insists, is required by section 153.8.

This argument, in our view, has two flaws. First, insofar as CGNL relies on Entex's failure to file the supplemental agreements, we agree that this violated sec-

---

4. Nor do we find support for CGNL's argument in the Commission orders issued in 1970 authorizing United Gas, a predecessor of Entex, to continue exporting natural gas to CGNL.

tion 153.8, but disagree that, as a result, the supplemental agreements are void.[5] In *Borough of Lansdale v. Federal Power Commission*, 161 U.S.App.D.C. 185, 494 F.2d 1104 (1974), a case involving comparable filing requirements under the Federal Power Act, this court rejected the attempt by a public utility company to circumvent its contractual obligations on the ground that the contract at issue had not as yet been filed with the Commission. "Breach of the filing obligation," this court held "gains the company nothing, for rates established in a . . . contract become effective for regulatory purposes even if the company bound by the contract neglects to file it." *Id.* at 194, 494 F.2d at 1113. That holding, we think, is equally applicable here even though Entex, unlike the public utility company in *Borough of Lansdale*, is seeking to enforce, rather than to abrogate, the unfiled contract. Accordingly, we conclude that, at least for regulatory purposes, CGNL is bound by the terms of the supplemental agreements even though they were not filed by Entex in accordance with section 153.8. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 338–39, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

▪ Second, insofar as CGNL relies on Entex's failure to obtain Commission approval of the supplemental agreements, we disagree that section 153.8 imposes such an obligation on Entex. In this regard, we

agree with the conclusion of the Commission in the decision under review that section 153.8 is simply a filing requirement, not an assertion of rate jurisdiction over exporters of natural gas. That section 153.8 incorporates in part section 154, which establishes the rules by which "natural gas companies" may change rates under sections 4 and 5 of the Act,[6] is not to suggest that the Commission is seeking to exercise over exporters of natural gas the same rate authority it exercises over natural gas companies. In fact, this court has held that the Commission lacks the authority to regulate directly natural gas exporters under the provisions of the Act expressly applicable only to natural gas companies. *Border Pipe Line Co. v. Federal Power Commission*, 84 U.S.App.D.C. 142, 171 F.2d 149 (1948). Nor is there any evidence to suggest that section 153.8 is an attempt by the Commission to exercise "indirect" rate jurisdiction under section 3 over natural gas exporters. *Compare Distrigas Corp. v. Federal Power Commission, supra*, 162 U.S.App.D.C. at 8, 495 F.2d at 1064. Accordingly, we hold that section 153.8 is no more than a filing requirement designed to elicit information relevant to the Commission's statutory obligation to ensure that the continued exportation of natural gas is not inconsistent with the public interest.

▪ Having rejected CGNL's arguments,[7] we conclude that the Commission

---

**5.** At oral argument, counsel for the Commission indicated that there are regulatory sanctions for failing to comply with the filing requirements, but that the Commission, in an exercise of its discretion, chose not to invoke those sanctions here because Entex had not acted intentionally in failing to file the amended contracts.

**6.** An exporter of natural gas that, like Entex, is not otherwise engaged in interstate gas transactions is not a "natural-gas company" within the meaning of the Act, because the Act defines a "natural-gas company" as a "person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale," Natural Gas Act § 2(6), 15 U.S.C. § 717a(6) (1976), and defines "interstate commerce" as "commerce between any point in a State and any point outside thereof, or between points within the same

State but through any place outside thereof, *but only insofar as such commerce takes place within the United States*," *id.* § 2(7), 15 U.S.C. § 717a(7) (emphasis added). *See Border Pipe Line Co. v. Federal Power Commission*, 84 U.S. App.D.C. 142, 171 F.2d 149 (1948).

**7.** CGNL also argues that the 1944 contract, by its own terms, "makes the filing requirements of [sections 153.8 and 154] a contractual condition precedent to the taking effect of the various amendments." In support of this assertion, CGNL relies solely on a paragraph of the 1944 contract providing that:

> Regardless of any other provision hereof, it is agreed that this contract shall not be effective until and unless proper authority is secured from the Federal Power Commission to export gas into the Republic of Mexico under what is known as the Natural Gas Act in

correctly determined, that at least insofar as its regulatory responsibility to ascertain the "public interest" is concerned, the contract rate as amended by the various supplemental agreements is the currently effective rate. To hold otherwise would be to lock Entex into a rate far below that applicable to its domestic customers. Recognizing this possibility, the Commission indicated that if the 1944 rate were applicable, it would consider reevaluating its decision that the continued exportation of gas is not inconsistent with the public interest. This further confirms our conclusion that, from a regulatory standpoint, the currently effective rate is not that specified in the 1944 contract.

We need not, and do not, decide whether the supplemental agreements are valid and binding upon the parties as a matter of contract law. That issue is presently pending in civil litigation in the District Court for the Southern District of Texas and, as the Commission noted, is more appropriately resolved in that forum.

### III

The issue in No. 78–1071 is whether the Commission erred in requiring Entex to procure Commission approval before invoking its contractual privilege to suspend deliveries to CGNL because of nonpayment. Seeking to overturn the Commission's decision, Entex argues that (1) the requirement that it obtain Commission approval nullifies a contractual right "absolutely essential if Entex's domestic customers are not to subsidize export service to foreign customers," and (2) in any event, the imposition of such a requirement was inappropriate on the facts presented here inasmuch as Entex never suspended its deliveries to CGNL.

In response, the Commission seeks to justify the requirement as a reasonable exercise of its statutory authority under section 3 to "from time to time, after opportunity

for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate." The "supplemental order" at issue here, we are told, draws support from *Distrigas* inasmuch as requiring Entex to obtain Commission approval before suspending deliveries is analogous to applying the abandonment provisions of section 7(b) of the Act, 15 U.S.C. § 717f(b) (1976). Ensuring continuity of service in the public interest, the Commission argues, is paramount in both cases, although concededly the abandonment provisions are designed to protect the service dependency of domestic customers, whereas the Commission's order, at least according to counsel, is designed to protect the United States against ill-will resulting from the suspension of foreign deliveries.

It is inappropriate, we think, to reach the merits of these arguments for two reasons. First, the court, at oral argument, was informed by counsel that, since December 1976, Pemex has been supplying most of the gas to CGNL (which has been taken over by the Mexican government), and that, in May 1978, Entex, at the request of the Mexican government, closed the valves to the supply system through which Entex had been exporting gas to CGNL, and has since that time supplied no gas at all to CGNL. These representations made at oral argument raise substantial doubt as to whether this case has continuing vitality insofar as the issue of Commission authority over termination of service is concerned.

■■ Second, although counsel for the Commission advanced plausible justifications for the Commission's order restricting Entex's contractual right to suspend service because of nonpayment, we note that, in the decision under review, the Commission itself offered no reasons at all for its order, apart from the conclusory observation that it had the authority to impose such a restriction and deemed it appropriate to do so.

accordance with the terms and provisions hereof.
It is our view, however, that this paragraph was designed to establish only that, by agreement of the parties, Commission approval was

a condition precedent to the contract taking effect in the first instance, rather than that Commission approval was a condition precedent to the effectiveness of amendments to the contract.

In assessing the legality of agency action, this court must look not to the reasons advanced by counsel, but rather to those in fact relied on by the agency in question. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The record in this case, we conclude, is insufficient to permit us to discharge our appellate function.

Accordingly, we find it necessary to remand this petition for review for both an inquiry into whether, in light of recent events, the controversy is now moot and, if it is not, a fuller statement of the Commission's reasons for restricting Entex's contractual right to suspend deliveries because of nonpayment.

### IV

In No. 78–1001, we affirm the Commission on the ground that it correctly determined that, at least for regulatory purposes, the contract rate as amended by the various supplemental agreements is the currently effective rate. In No. 78–1071, we remand for an inquiry into possible mootness and a fuller statement of reasons.

*It is so ordered.*